# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50951-2-II |
| Respondent, | |
| v. | |
| MIN SIK KIM, | PUBLISHED IN PART OPINION |
| Appellant. | |

MELNICK, J. — Min Sik Kim plead guilty to murder in the second degree, a serious violent offense. He appeals his sentence. In the published portion of this opinion, we reject Kim's argument that he should have received credit for his presentence electronic home monitoring (EHM). The 2015 amendment to RCW 9.94A.505 precludes felons convicted of certain crimes, including murder in the second degree, from receiving credit for time served on EHM before sentencing. In the unpublished portion of this opinion, we reject Kim's other arguments regarding his sentence. We affirm.

## FACTS

In March 2016, Kim shot and killed Jakeel Mason who attempted to steal items from Kim's convenience store. The State charged Kim with murder in the second degree. Pretrial, the court released Kim from custody but imposed numerous conditions including he could only reside at his home address, he could not travel outside Pierce, King, Thurston, or Kitsap counties, he could not contact victims or witnesses, he could not possess weapons or firearms, and he could not consume or possess alcohol or marijuana. The court also ordered him to be on EHM.

Approximately one year later, Kim plead guilty to the murder charge. Pending sentencing, the court released Kim on similar conditions, including continued EHM.

The court sentenced Kim to 100 months. Kim sought credit for the 450 days he had spent on EHM. Because of RCW 9.94A.505(7), the court did not give Kim credit for time spent on EHM. Kim appeals.

ANALYSIS

Kim argues that RCW 9.94A.505(7) violates the double jeopardy, equal protection, and due process clauses of the United States and Washington constitutions.[1] We disagree.

I.      APPLICABLE STATUTES

The general rule is that a person shall receive credit for time served in confinement. RCW 9.94A.505(6). The term "confinement" means "total or partial confinement." RCW 9.94A.030(8). Under RCW 9.94A.030(36), "partial confinement" includes electronic monitoring. However, a "sentencing court shall not give [an] offender credit for any time the offender was required to comply with an electronic monitoring program prior to sentencing if the offender was convicted of . . . [a] violent offense." RCW 9.94A.505(7)(a).[2]

Murder in the second degree is a serious violent offense and a subcategory of a violent offense. RCW 9.94A.030(46)(a)(iii).

---

[1] The State argues that Kim failed to present an adequate record for review of Kim's double jeopardy, equal protection, and due process claims. We disagree. However, as to Kim's due process claim, Kim only provided conclusory arguments and passing treatment to this issue; therefore, we do not consider it. RAP 10.3(a)(6); *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004).

[2] The legislature added this subsection in 2015. LAWS OF 2015, ch. 287, § 10.

II.    DOUBLE JEOPARDY

Kim argues that because he served 450 days on EHM, and because EHM continues to be statutorily defined as "confinement," RCW 9.94A.505(7) is punitive in intent. Therefore, Kim claims that he is being subjected to unconstitutional "confinement" twice for the 450 days he served on EHM. We disagree.

The Fifth Amendment to the United States Constitution[3] and article I, section 9 of the Washington Constitution provide a prohibition against double jeopardy that protects defendants from multiple punishments for the same offense. *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010).

Double jeopardy challenges are analyzed using a two-part test. The first part asks whether the government intends the action to be punitive, and if it does not, the second part asks whether the action's purpose or effect is nevertheless so punitive as to negate the government's nonpunitive intent. *Harris v. Charles*, 171 Wn.2d 455, 467, 256 P.3d 328 (2011). Kim only alleges a violation of the first part of the test.

As noted previously, partial confinement includes EHM. RCW 9.94A.030(36). In 2015, the legislature amended RCW 9.94A.505 to exclude credit for any time served presentence on EHM if the offender was convicted of a violent offense. RCW 9.94A.505(7); LAWS OF 2015, ch. 287, § 10. The 2015 amendment did not affect RCW 9.94A.505(6) or any relevant RCW 9.94A.030 definitions. We need to determine if the legislature's changes evince an intent that presentence EHM is punitive. *Harris*, 171 Wn.2d at 467.

---

[3] This provision applies to states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

In *Harris*, the court decided that pretrial EHM for a misdemeanor was not punitive. When "imposed as a condition of pretrial release pursuant to CrR 3.2 or CrRLJ 3.2, [EHM] is not intended as punishment but rather as a means of alleviating the burdens of pretrial detention and of assuring the defendant's future appearance in court." *Harris*, 171 Wn.2d at 469 n.10. In determining whether the purpose or effect was punitive, *Harris* noted the "clear distinction [Washington courts recognize] between jail time and nonjail time." 171 Wn.2d at 470. *Harris* concluded that the petitioner failed to "explain how his time on EHM was so punitive in effect as to overcome its intended nonpunitive purpose." 171 Wn.2d at 472.

For further support that presentence EHM is not punitive, as stated in *Harris*, "a defendant in pretrial detention 'is severely handicapped in his defense preparation' and 'is often unable to retain his job and support his family, and is made to suffer the public stigma of incarceration even though he may later be found not guilty.'" 171 Wn.2d at 468 (quoting CRIMINAL RULES TASK FORCE, WASHINGTON PROPOSED RULES OF CRIMINAL PROCEDURE Rule 3.2 cmt. at 22 (1971)). "As a condition of pretrial or presentencing release, EHM addresses these concerns and furthers the intent of the original pretrial release rule because a defendant on EHM may visit his attorney and continue to go to a job." *Harris*, 171 Wn.2d at 469.

The Minority and Justice Commission proposed adding EHM as an alternative to be used with pretrial release to avoid discrimination based on people who are economically disadvantaged. *Harris*, 171 Wn.2d at 469 (citing Proposed amendment to CrR 3.2, 145 Wn.2d Proposed–67 (Official Advance Sheet No. 4, Jan. 8, 2002)). It was not proposed as punishment. *Harris*, 171 Wn.2d at 469.

Kim argues that because the legislature amended RCW 9.94A.505 to deny EHM credit for certain crimes but did not modify the definition of "confinement" in RCW 9.94A.030, Kim is

subject to double "confinement," and the amended law fails the first prong of the double jeopardy test because it is punitive in its intent. We disagree.

Kim's argument conflates the statutory definition of "confinement" with the constitutionally mandated double jeopardy term of "incarceration." The Washington and United States constitutions require only that defendants receive credit for time served for the latter. *Harris*, 171 Wn.2d at 470-71 ("[T]his court has acknowledged that credit for home detention time might not be constitutionally required. . . . [While] double jeopardy demand[s] that all defendants receive credit for time spent in incarceration prior to sentencing.").

As discussed above, *Harris* makes clear that EHM as a condition of pretrial release is not intended as punishment. 171 Wn.2d at 469 & n.10. As a result, we conclude that the legislature did not intend presentence EHM as punishment.

IV.    EQUAL PROTECTION

Kim argues that the 2015 amendment to RCW 9.94A.505 violates equal protection because it makes two arbitrary classifications. First, Kim argues that it draws improper classifications between different crimes. For example, the amendment permits sentencing courts to give credit for EHM to white collar criminals but not to murderers, as is the case here. Second, he contends it draws improper classifications among defendants who have committed the same crime. For example, Kim argues that if one person is released without any conditions and the other is released subject to EHM, the person who is subject to EHM will end up serving more time in "confinement" for the same crime and for the same sentence. We disagree that there is an equal protection violation.

"Equal protection requires that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." *State v. Simmons*, 152 Wn.2d 450, 458, 98 P.3d 789

5

(2004). Article I section 12 of the Washington Constitution and the equal protection clause of the Fourteenth Amendment are "substantially identical and they are thus considered one issue." *In re Pers. Restraint of Ramsey*, 102 Wn. App. 567, 573, 9 P.3d 231 (2000). "Equal protection is not intended to provide complete equality among individuals or classes but equal application of the laws." *Simmons*, 152 Wn.2d at 458.

The parties agree that under *Harris*, Kim's equal protection argument should be analyzed under the rational basis test because "it does not involve a suspect or semisuspect class or a fundamental right." 171 Wn.2d at 463. Under rational basis review, "[a] party challenging the application of a law as violating equal protection principles has the burden of showing that the law is irrelevant to maintaining a state objective or that it creates an arbitrary classification." *Simmons*, 152 Wn.2d at 458.

In *Harris*, the court concluded that two legitimate government interests rationally related to the legislature's decision to allow felons, but not misdemeanants, sentencing credit for presentence EHM. 171 Wn.2d at 462-66. First, "[r]equiring courts to grant misdemeanants credit for time on EHM would hinder the ability of sentencing judges to order jail time for misdemeanor offenses." *Harris*, 171 Wn.2d at 473. Second, the distinction maintained misdemeanor sentencing courts' discretion to impose rehabilitative sentencing, which is a goal of nonfelony sentencing but is "not a justification for [felony] sentencing under the [Sentencing Reform Act of 1981 (SRA)]." *Harris*, 171 Wn.2d at 465.

But in *State v. Anderson*, 132 Wn.2d 203, 213, 937 P.2d 581 (1997), the court held that no rational basis existed for the legislature to distinguish between presentence and post-sentence EHM. The statutes at issue in *Anderson* required sentencing courts to give credit for the former but not the latter. 132 Wn.2d at 208-09.

Here and in *Harris* we are looking at what crimes are eligible for credit for presentence time spent on EHM. *Anderson* discussed the differences between presentence and post-sentence EHM. Therefore, *Harris* is more on point. A rational basis supports the legislature's decision.

Here, as Kim points out, the 2015 amendment leads to two classifications. First, the amendment distinguishes between felons convicted of violent offenses and felons convicted of all other felonies not listed in the statute. RCW 9.94A.505(6)-(7). Second, the amendment distinguishes between violent offenders, i.e., between defendants released on presentence EHM who are "confined" but not given credit for that confinement and defendants released with no conditions who do not serve an additional and unaccounted for "confinement" period.

Regarding Kim's first argument, a rational basis exists for the legislature's decision to not allow credit for time served on presentence EHM release. The legislature has made a determination that people who are convicted of more serious crimes should not get credit for time served on presentence EHM.

The State has at least two legitimate interests and must balance these sometimes-competing interests. First, it has a legitimate interest in protecting its citizens. It also has a legitimate interest in affording criminal defendants adequate defense preparation. EHM can conflict with the State's first interest, but it undoubtedly furthers the State's second interest. *See Harris*, 171 Wn.2d at 469. In an attempt to balance these interests, the legislature looked to the relative seriousness of various crimes to determine which felons should receive credit for presentence EHM. Thus, the legislature has made a determination that people who are charged with more serious crimes are a greater threat to society and should not receive presentence EHM credit. There is a sufficient rational basis for the legislature to make this distinction because it is an attempt to balance and further its two legitimate interests identified above.

As to Kim's second argument, there is also a rational basis. Kim argues that the legislature's action had no rational basis because, as currently defined, the statute imposes more "confinement" on defendants subject to EHM than on defendants who committed the same crime and were sentenced identically but who were released without any conditions. However, there is a rational basis for the legislature to distinguish between these two types of defendants because other factors, including a person's flight risk, are taken into consideration by a judge in determining whether a defendant should be released on EHM or without conditions. CrR 3.2. Kim's argument is based on the legislature's use of the term "confinement." But the legislature, in making a specific statute, carved out an exception for when confinement does not include EHM. Kim's argument is based on nomenclature, not constitutional grounds.

We conclude that RCW 9.94A.505(7) does not violate Kim's equal protections rights.

CONCLUSION

RCW 9.94A.505(7) does not infringe Kim's constitutional rights under the double jeopardy or equal protection clauses under the United States and Washington constitutions. We affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

ADDITIONAL FACTS

Kim plead guilty to felony murder in the second degree predicated on assault in the second degree. Kim's standard range for felony murder in the second degree was 123 to 220 months. The State recommended a 123-month sentence, and Kim sought an exceptional downward sentence of 24 months. Kim's sentencing memorandum detailed his immigration from South Korea, his work ethic, his commitment to family and worship, his compliance with law enforcement after the

8

incident, and the fact that his wife had been shot by a robber at their convenience store one month prior to the incident. Kim stated that he was still under the influence of that traumatic experience on the day of the incident. Kim's sentencing memorandum attached 10 letters of support from members of the community.

At Kim's sentencing hearing, he attempted to present three individuals to make statements on his behalf. The court stated,

> I've read the letters, and if these people are here to simply retell what they've already written in the letters, it kind of gets—you know, I don't need to hear it again necessarily, but if there's one person that you would like to have speak on your behalf, I would be more than—even if he's written a letter before, I would be happy to hear that person.

Report of Proceedings (RP) (June 23, 2017) at 7. Kim's wife gave a statement on his behalf. Kim also gave a statement.

The State requested that the judge review three excerpts of security footage from the incident. The court refused, stating,

> Counsel, I'm not going to have time to review this tape. I've got a jury deliberating, and they have a question that we've deferred until we can resolve this case because this case has priority.

RP (June 23, 2017) at 13. At the court's request, the State then discussed how it viewed the surveillance footage: "when I look at these tapes, I see a very angry man, and I see a man that's taking out his anger about what happened to his wife against a shoplifter." RP (June 23, 2017) at 14.

The court then permitted the defense to supplement the State's statement. The defense stated,

> I don't disagree with what [the State] said, in that most of what [it] said is in the probable cause statement that the Court referred to. I would only add that there were some disputed issues with a witness who said there was a struggle about the firearm as [Kim and Mason] were fighting on the ground.

9

RP (June 23, 2017) at 15-16.  The court then concluded,

> Well, I'm not going to view the video because I have a sense of what occurred here from listening to you, as well as reading the Affidavit of Probable Cause, which I think is pretty accurate in terms of what the video showed.

RP (June 23, 2017) at 16.

The court then discussed its reasons for granting the defense's request for an exceptional downward sentence.  The court did not grant the defense's request for a 24-month sentence; instead, the court imposed a 100-month sentence.  The court stated,

> I don't believe 24 months, Counsel, in all fairness, would reflect a just sentence for the deliberate taking of a life, but I am taking into consideration the other factors that you've argued and making the mitigation to 100 months.

RP (June 23, 2017) at 19.  The court then entered findings of fact and conclusions of law.

## ANALYSIS

I.     FAILURE TO CONSIDER EVIDENCE AT SENTENCING

Kim argues that the sentencing court committed reversible error when it restricted who spoke on Kim's behalf and when it relied on the State's version of what the surveillance video showed.  We disagree.

    A.     Restricting Who Spoke[4]

        1.     Allocution

Kim argues that the trial judge violated his right to allocution by refusing to hear from the defense's proffered witnesses.  We disagree.

"Allocution is the right of a criminal defendant to make a personal argument or statement to the court before the pronouncement of sentence." *State v. Canfield*, 154 Wn.2d 698, 701, 116

---

[4] We reject the State's argument that Kim did not preserve this issue, and we decide it on the merits.  CR 46; CrR 8.6.

P.3d 391 (2005). Because Kim was allowed to speak at his sentencing hearing, we conclude that his statutory right to allocution was not denied.

> 2.      SRA

Kim argues that the trial judge violated the SRA by refusing to hear the defense's proffered witnesses. We disagree.

"[A]n offender may always challenge the procedure by which a sentence was imposed." *State v. Grayson*, 154 Wn.2d 333, 338, 111 P.3d 1183 (2005). But, in order to allege such a procedural error, the appellant must show "that the sentencing court had a duty to follow some specific procedure required by the SRA, and that the court failed to do so." *State v. Mail*, 121 Wn.2d 707, 712, 854 P.2d 1042 (1993).

Under the SRA,

> The court shall consider the risk assessment report and presentence reports, if any, including any victim impact statement and criminal history, and allow arguments from the prosecutor, the defense counsel, the offender, the victim, the survivor of the victim, or a representative of the victim or survivor, and an investigative law enforcement officer as to the sentence to be imposed.

RCW 9.94A.500(1).

Here, Kim has not shown how the sentencing court's decision to restrict the number of statements given on his behalf violated the SRA. Accordingly, we conclude that no procedural error occurred.

> B.      The State's Comment on the Unwatched Video

Kim argues that the court violated the SRA by allowing the prosecution to describe what the video showed rather than watching the video. We disagree.

The record shows that Kim did not object to the State's comment or request an evidentiary hearing. Generally, we will not review an issue raised for the first time on appeal. RAP 2.5(a). A

party must make a timely and specific objection at trial unless the error constitutes a "manifest error affecting a constitutional right." RAP 2.5(a)(3). When the defendant fails to object to an alleged error at trial, he "has the initial burden of showing that (1) the error was 'truly of constitutional dimension' and (2) the error was 'manifest.'" *State v. Grimes*, 165 Wn. App. 172, 185-86, 267 P.3d 454 (2011) (quoting *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)).

Kim fails to show how the State's comment constituted manifest error affecting a constitutional right. Accordingly, we conclude that Kim waived his challenge to the State's comment.

## II.    ERRONEOUSLY CLASSIFYING KIM'S CONVICTION

Kim argues that the sentencing court abused its discretion by basing the length of his exceptional sentence below the standard range on a misunderstanding of his crime. We disagree.

The duration of an exceptional sentence is clearly too excessive or lenient only when it constitutes an abuse of discretion. *State v. Oxborrow*, 106 Wn.2d 525, 530, 723 P.2d 1123 (1986). "[D]iscretion is abused if it is exercised on untenable grounds or for untenable reasons, such as a misunderstanding of the underlying law that causes nonharmless error." *State v. Burke*, 163 Wn.2d 204, 210, 181 P.3d 1 (2008).

"Washington is a written order state." *State v. Huckins*, 5 Wn. App. 2d 457, 469, 426 P.3d 797 (2018). "[A] trial court's oral statements are 'no more than a verbal expression . . . and may be altered, modified, or completely abandoned.'" *State v. Dailey*, 93 Wn.2d 454, 458, 610 P.2d 357 (1980) (quoting *Ferree v. Doric Co.*, 62 Wn.2d 561, 567, 383 P.2d 900 (1963)).

Here, the State charged felony murder in the second degree[5] and Kim plead guilty to it. This crime does not require the "intent to cause the death of another person." RCW

---

[5] RCW 9A.32.050(1)(b).

9A.32.050(1)(a).  At Kim's sentencing hearing, however, the judge indicated that Kim plead guilty to murder in the second degree predicated on intentional murder.  But Kim's judgment and sentence, filed the same day as his sentencing hearing, recognized that Kim plead guilty to felony murder under RCW 9A.32.050(1)(b).  Therefore, to the extent the judge erroneously described Kim's conviction during his sentencing hearing, the judgment and sentence clarified that the judge was aware of the crime to which Kim plead guilty.  Accordingly, we conclude that the trial court did not base its decision of imposing an exceptional downward sentence of 100 months on a misunderstanding of the legal violation to which Kim plead guilty, and therefore, it did not abuse its discretion.

We affirm.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Lee, J.

13