IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>THOMAS A. SHOTWELL,<br><br>Appellant. | No. 87682-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — A jury convicted Thomas Shotwell of murder in the second degree, while armed with a firearm. Shotwell argues that his trial counsel rendered constitutionally ineffective assistance by failing to investigate and present evidence to support a defense of diminished capacity. Shotwell also challenges the trial court's admission of evidence of a firearm not used in the crime and the denial of a motion to credit his sentence with presentence time served out of custody, subject to electronic home monitoring (EHM). Separately, Shotwell raises additional claims of error in a Statement of Additional Grounds for Review (SAG). Because Shotwell fails to establish ineffective assistance of trial counsel or other

reversible error, we affirm his judgment and sentence.

## I. BACKGROUND

According to the undisputed facts established by the testimony at trial, Shotwell's[1] twin brother, Raymond, was playing video games while simultaneously communicating with a friend over the internet on the evening of June 16, 2021. At 8:30 p.m., Raymond abruptly disconnected from the game and did not respond to his friend's later attempt to contact him.

Shotwell later discussed his spotty recollection of the incident with forensic psychiatrist, Dr. Richard Adler. Shotwell said he came home on the evening in question to find Raymond using the internet and disconnected it, although Raymond instructed him not to. Shotwell later smoked marijuana. Shotwell remembered feeling paranoid and afraid that Raymond was going to kill him. Shotwell retrieved a firearm, shot his brother, and could not remember anything after that.

About five hours after the internet was disconnected, Shotwell called 911. Shotwell provided his name and address, and reported that he shot and killed his brother. In a second call, Shotwell provided the same information and asked the dispatcher to "send police down there." Shotwell reported that he was no longer at the residence but left the firearm "on the counter."

When law enforcement responded to the address, they found Raymond's body on the floor underneath a pile of boxes, having sustained apparent gunshot

---

[1] We refer to Shotwell's brother by his first name for clarity and intend no disrespect by doing so.

wounds. Police officers also found a loaded firearm on a counter, a handwritten document labeled "Will" that purported to bequeath an "AR" firearm, among other items of personal property, and "range style" hearing protection in the area where the shooting took place. A later autopsy indicated that five or six bullets struck Raymond in various places, including his neck and head.

Several hours after the 911 calls, police officers located Shotwell in a truck registered to his mother several miles from the residence. He was unresponsive. Police officers removed Shotwell from the vehicle, found that his insulin pump had been removed, and transported him to the hospital.[2] Because Shotwell was in a "borderline comatose" state with an extremely low blood sugar level, he was admitted to the hospital and the treating physician diagnosed him with an insulin overdose. Police found an AR-15 firearm in the backseat of the truck, which was "within arm's reach" of the driver's seat, and was "loaded and ready for fire."[3]

The State charged Shotwell with murder in the first degree. A six-day trial took place in October 2023. Shotwell asserted that he was not guilty by reason of insanity (NGRI) at the time of the offense, and supported the claim with the evaluation of Dr. Adler. The parties presented the testimony of 13 witnesses, including Dr. Adler and Dr. Haley Gummelt, a psychologist who also evaluated Shotwell and testified on rebuttal on behalf of the State.

---

[2] According to Shotwell's mother, Shotwell was diagnosed as a "Type 1 diabetic" at 10 months old.

[3] Shotwell's mother testified that she placed the AR-15 firearm in the truck, where she routinely kept it, but did not typically drive around with loaded weapons and agreed that she "would not have placed it in the vehicle with a round in the chamber."

Dr. Adler testified at trial that Shotwell suffered from a neurocognitive disorder due to brain damage related to hypoglycemic encephalopathy, a complication resulting from low glucose, and cannabis-induced psychosis. Dr. Adler concluded, to a reasonable degree of medical certainty, that at the time of the offense, Shotwell's impairment rendered him unable to understand the wrongfulness of his actions. Dr. Gummelt disagreed. She diagnosed Shotwell with "major depressive disorder single episode," but concluded that Shotwell was sane at the time of the crime, finding no evidence of a mental condition that impaired Shotwell's ability to perceive the nature of his acts or right from wrong.

The jury rejected Shotwell's insanity defense, found him guilty of the lesser-included charge of murder in the second degree, and determined that he was armed with a firearm at the time of the crime.[4] The court imposed a sentence of 183 months of total confinement, the bottom of the standard range. The court denied Shotwell's request to credit his sentence with nearly two years' presentence time spent on EHM.

Shotwell appeals.

## II. ANALYSIS

### A. Ineffective Assistance of Counsel-Diminished Capacity

Shotwell contends the attorneys who represented him at trial rendered ineffective assistance of counsel by failing to "properly investigate and perfect" the defense of diminished capacity.

---

[4] The trial court denied Shotwell's motion for acquittal by reason of insanity after the presentation of the evidence.

To prevail on a claim of ineffective assistance of counsel, Shotwell must establish that defense counsel's representation was deficient, in that it fell below an objective standard of reasonableness, and the deficient performance was prejudicial. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009); *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Legitimate trial strategy cannot serve as the basis for a claim of ineffective assistance of counsel. *State v. Aho*, 137 Wn.2d 736, 745-46, 975 P.2d 512 (1999). We presume that counsel's performance was not deficient. *State v. Lord*, 117 Wn.2d 829, 883, 822 P.2d 177 (1991). Prejudice results when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). If either part of the test is not satisfied, the inquiry ends. *Lord*, 117 Wn.2d at 883-84. A claim of ineffective assistance of counsel presents a mixed question of fact and law, which we review de novo. *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 865, 16 P.3d 610 (2001).

Shotwell's counsel initially indicated that, based on consultation with Dr. Adler, who was in the process of evaluating Shotwell and preparing a report, he would likely rely on defenses of both NGRI and diminished capacity. But ultimately, Dr. Adler's 49-page report addressed only NGRI. As to diminished capacity, the report noted that Dr. Adler "in the future, may elect" to address the relevance of diminished capacity. A few months before trial, Shotwell identified NGRI as his sole defense.

At trial, the State made a formal motion to exclude all evidence of

diminished capacity, pointing out that because Dr. Adler's report did not address it, the State had no opportunity to obtain a responsive expert opinion. The defense opposed the motion, arguing that, since diminished capacity is not technically an affirmative defense and simply a basis to argue that the State failed to prove intent, the State was not entitled to notice and expert opinion testimony was not necessary. The trial court granted the State's motion, indicating that the court would not instruct the jury on diminished capacity and the defense expert should not testify about diminished capacity.

A defendant may raise the defense of diminished capacity to argue that he or she lacked the ability to form a specific intent due to a mental disorder not amounting to insanity. *State v. Ferrick*, 81 Wn.2d 942, 944, 506 P.2d 860 (1973). Shotwell points out that, contrary to his counsel's assertion at trial, in order to raise diminished capacity, a defendant must produce expert testimony in support of the defense. *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001). Given this requirement and counsel's earlier representation that Shotwell would pursue a diminished capacity defense, Shotwell claims that it was "incumbent" on counsel to obtain a supplemental evaluation.

But Shotwell must show deficient performance and prejudice based only on the record of the proceedings below. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Shotwell claims that "persuasive evidence" in the record demonstrates that his counsel failed to obtain a supplemental evaluation because his counsel misunderstood the law, specifically, the requirements of a diminished capacity defense. The record does not establish that his counsel's performance

was deficient in that way, for two reasons.

First, his counsel's argument reasonably may be construed as simply asserting that expert testimony is not necessary to challenge proof of intent, which is a legal claim Shotwell does not challenge as ineffective.

Second, it does not necessarily follow from whatever argument he made to the trial court that the reason his counsel did not obtain a supplemental evaluation was because of a legal determination described on the eve of trial. His counsel may have done so for legitimate trial strategy reasons instead, well ahead of trial. *Aho*, 137 Wn.2d 745-46. The record is clear that defense counsel had consulted with Dr. Adler about a diminished capacity defense as it is explicitly referenced in Dr. Adler's report. And, on this record, it is reasonable to presume as we must, *Lord*, 117 Wn.2d at 883, that his counsel and Dr. Adler further explored the defense and concluded it was in Shotwell's best interest for Dr. Adler to opine only on NGRI, and not diminished capacity, whether because of the relative strength of the diminished capacity defense  or to focus the jury's attention on Dr. Adler's presentation of the NGRI defense. Shotwell points to nothing in the record that would permit us to conclude otherwise, as is his burden. *McFarland*, 127 Wn.2d at 335.

Relatedly, Shotwell's claim of prejudice rests on the unsupported assumption that a supplemental evaluation addressing diminished capacity would have been favorable to him. Such bald assumptions do not establish the reasonable probability the result would have been different, as Shotwell must establish. *Thomas*, 109 Wn.2d at 226.

7

Moreover, the claim is based on a further assumption that the outcome would have been different if the jury had been presented with additional evidence. But, again, since additional evidence the jury could have theoretically considered is not in the record, there is no way for this court to evaluate its potential effect.

Still, here, as in *State v. Cienfuegos*, "both the prosecutor and defense counsel argued extensively about [the defendant's] ability to have knowledge or form the requisite intent" and the jury had before it instructions from which it "could have taken into account [his] impairment." 144 Wn.2d 222, 230, 25 P.3d 1011 (2001). Thus, "even without [a diminished capacity instruction,] defense counsel was able to argue his theory of the case," even if the lawyers and their experts did not utter the legal term "diminished capacity" during trial. Id.

On this record, Shotwell cannot establish deficient performance or prejudice.

B. Firearm Evidence

Shotwell next argues that the trial court abused its discretion when it denied his motion to exclude evidence of the AR-15 in his possession after the shooting.

This court reviews "decisions to admit evidence using an abuse of discretion standard." *State v. Quaale*, 182 Wn.2d 191, 196, 340 P.3d 213 (2014). The proponent of evidence has the burden of establishing that the evidence is relevant. *State v. Pacheco*, 107 Wn.2d 59, 67, 726 P.2d 981 (1986). "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Under ER 403, "[a]lthough

relevant, evidence may [still] be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Shotwell claims the evidence that he possessed a firearm not used in the crime was unduly prejudicial and cumulative of other evidence that he exhibited "objective driven behavior." Shotwell further maintains that, since the trial court excluded evidence of diminished capacity, his ability to form the required intent was not in dispute.

In order to prove the crime of conviction, the State was required to prove that Shotwell acted intentionally with "the objective or purpose to accomplish" Raymond's death. *See* RCW 9A.32.050(1)(a) (second degree murder requires that a person "inten[ds] to cause the death of another person but without premeditation, he or she causes the death of such person"); RCW 9A.08.010(1)(a) (criminal intent is defined as "act[ing] with the objective or purpose to accomplish a result"). Shotwell did not stipulate to any element of the crime. As a general matter, the prosecution is "entitled to prove its case by evidence of its own choice in order to present its case with full evidentiary force." *State v. Taylor*, 193 Wn.2d 691, 698, 444 P.3d 1194 (2019).

The entire focus of the case was Shotwell's state of mind, and whether he was able to "perceive the nature and quality of the acts" he was charged with committing and appreciate "right from wrong" with respect to those acts. As the State argued, evidence that Shotwell loaded the AR-15 and had the weapon within

his reach as he left the scene of the crime supported its position that Shotwell acted with intent when he shot Raymond, understood the nature of his actions, and appreciated the gravity and wrongfulness of his conduct. The evidence also supported the inference that, after the shooting, Shotwell devised and followed a plan to end his life in response to his actions. In short, the evidence was logically relevant to issues the State was required to prove and to the rebuttal of Shotwell's defense.

As to the potential prejudicial impact, Shotwell claimed that the "status" of the weapon as an "assault rifle" could engender "controversy and emotion." However, the State did not focus on or discuss the type of firearm and did not argue or suggest that Shotwell posed an "imminent threat to law enforcement," as he claims. In order to minimize any potential prejudice, the court expressly limited the presentation of the evidence, ruling that the State would not be allowed to display the firearm in court. The trial court did not abuse its discretion in concluding that the prejudicial impact did not outweigh the probative value of the firearm evidence.

C. Credit for Time Served on EHM

Shotwell next challenges the trial court's denial of his request for credit for time served out of custody, subject to EHM. His argument involves questions of law that we review de novo. *State v. Swiger*, 159 Wn.2d 224, 227, 149 P.3d 372 (2006).

A provision of the Sentencing Reform Act of 1981 (SRA), RCW 9.94A.505(7)(a) specifically addresses credit for time served on EHM before

sentencing. Under RCW 9.94A.505(7)(a), the "sentencing court *shall not* give the offender credit for any time the offender was required to comply with an electric home monitoring program prior to sentencing if the offender was convicted of … [a] violent offense." (Emphasis added)

Shotwell does not dispute that he was convicted of a violent offense and was "required to comply with an [EHM] program."[5] Instead, Shotwell contends that, in precluding credit for presentence time on EHM release, RCW 9.94A.505(7)(a) is unconstitutional.

Shotwell's argument is entirely based on cases that predate the 2015 enactment of the applicable statute, RCW 9.94A.505(7).[6] *See*, *e.g.*, *State v. Speaks*, 119 Wn.2d 204, 208-09, 829 P.2d 1096 (1992) (holding that EHM constitutes confinement under the SRA); *State v. Anderson*, 132 Wn.2d 203, 213, 937 P.2d 581 (1997) (holding that equal protection clause requires defendants under posttrial EHM receive credit for time served in the same manner as defendants on pretrial EHM); *Swiger*, 159 Wn.2d at 231 (holding "until and unless the legislature acts otherwise," defendants are entitled to credit for time served on home detention pending appeal). More importantly, Shotwell fails to address the decision of Division Two of this court, rejecting an equal protection challenge to RCW 9.94A.505(7), the same claim Shotwell asserts here.[7] *State v. Min Sik Kim*,

---

[5] Murder in the second degree is a serious violent offense and a subcategory of a violent offense. RCW 9.94A.030(46)(a)(iii).

[6] LAWS OF 2015, ch. 287 § 10.

[7] Shotwell also mentions due process on appeal, but did not raise a due process claim below, provides no specific argument related to due process on appeal, and his passing treatment is insufficient to warrant judicial consideration. *State v. Min Sik Kim*, 7 Wn. App. 2d 839, 842 n.1, 436 P.3d 425 (2019).

7 Wn. App. 2d 839, 848, 436 P.3d 425 (2019), *review denied*, 193 Wn.2d 1037 (2019). Specifically, the court concluded the legislature had a rational basis to distinguish between felons convicted of violent crimes and those convicted of other crimes, and between individuals released on EHM and those released from custody but not subject to EHM. *Kim*, 7 Wn. App. 2d at 847-48. The reasoning in *Kim* is persuasive and, contrary to Shotwell's assertion in reply, the court's analysis was based solely on the statutory language, not on the severity of the non-EHM conditions of confinement. The trial court did not err in denying Shotwell's motion for presentence time served on EHM.

D. <u>Statement of Additional Grounds for Relief (SAG)</u>

In his pro se SAG, Shotwell raises additional claims of ineffective assistance of counsel. First, Shotwell asserts that trial counsel performed deficiently by failing to present "[s]upporting evidence" that he suffered from side effects of one of his prescribed medications, Singulair,[8] and evidence of possible effects of this medication when used in combination with cannabis.

Shotwell identifies no evidence in the record to show that counsel ignored exculpatory evidence about medication side effects or combined effects with cannabis. On direct appeal, we may not consider any claims that rely on evidence outside of the appellate record. *See McFarland*, 127 Wn.2d at 338 n.5 ("[A] personal restraint petition is the appropriate means of having the reviewing court consider matters outside the record.").

---

[8] Singulair is the brand name for Montelukast, a medication used to treat symptoms of asthma and allergies.

Second, Shotwell claims trial counsel was constitutionally deficient because he misstated two facts in closing argument, and the State later highlighted those mistakes on rebuttal. But neither misstatement involved critical or disputed facts. Counsel described the firearm used in the crime as an "automatic," rather than a semi-automatic, in the context of arguing that firing multiple rounds did not necessarily allow time to premeditate. And counsel referred to Shotwell's "PhD" in engineering, rather than his master's degree, in anticipation of the State's argument that Shotwell's qualification demonstrated a level of functioning that was inconsistent with a serious mental condition.

The jury instructions and each attorney individually informed the jury that counsel's statements were not evidence and directed the jury to rely solely on the evidence, not counsel's representations. And since the jury acquitted Shotwell of the more serious charge of murder in the first degree, it is unclear how he was prejudiced by the reference to an automatic weapon. Likewise, Shotwell fails to demonstrate a likelihood that confusion about the type of advanced degree he obtained made a difference to the outcome.

Third, Shotwell claims counsel performed deficiently by not objecting when the State argued in closing that he removed his insulin pump partly to avoid alerting his mother to his high insulin level and when the prosecutor stated that, "Tom said he had a PhD." But when and whether to object is "a classic example of trial tactics," and Washington courts presume strategic reasons for the absence of objection. *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989); *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). A failure to object during

closing arguments generally does "not constitute deficient performance because lawyers 'do not commonly object during closing argument absent egregious misstatements.'" *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 721, 327 P.3d 660 (2014) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 717, 101 P.3d 1 (2004)).

Shotwell's mother clarified in later remarks that a different device, not the insulin pump itself, transmitted information about insulin levels. Nevertheless, the trial testimony supported the inference argued by the State that Shotwell removed the insulin pump to facilitate an intentional medication overdose and to avoid detection. And although the prosecutor misspoke when he attributed the statement about a PhD to Shotwell (instead of defense counsel), the context of the argument was that the jury should ignore the attorneys' factual assertions that did not align with the testimony. Because there was nothing egregious or especially prejudicial in the identified remarks, the failure to object was not ineffective assistance. For the same reasons, the remarks did not amount to misconduct.

Finally, as Shotwell does not demonstrate error, let alone multiple errors, there was no cumulative error. *See State v. Hodges*, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003) (the cumulative error doctrine applies only when combined trial court errors may deny a defendant a fair trial). And since the record does not include a restitution order or otherwise indicate that the court imposed restitution, we do not address Shotwell's challenge to the amount of the State's restitution request.

III.    CONCLUSION

Affirmed.

Díaz, J.

WE CONCUR:

Feldman, J.                    Chung, J.